JAKOPAC, Respondent, vs. NEWPORT MINING COMPANY, Appellant.

*March 13—April 8, 1913.*

*Master and servant: Injury: Unsafe working place: Assumption of risk: Assurance of safety: Right to rely thereon: Questions for jury: Evidence: Adverse witness: Cross-examination: Opinions: Arguments of counsel: Improper statements: Damages: Appeal: Harmless errors.*

1. The rule requiring the employer to furnish the servant a safe place to work has no proper application to such operations as building, mining, or the like, where the working place is constantly changing and the servant is assisting in making the change himself.

2. In the absence of statutory provision an adult servant assumes the ordinary risks of his employment, and where he enters upon a task attended by dangers which are just as obvious and apparent to him as to the master, this rule applies notwithstanding an assurance by the master or his representative that there is no danger.

3. But if the employee has no actual knowledge of the danger, and it is not obvious to the sense but only to be ascertained by careful examination or test, and the master or his representative having superior knowledge of the situation, or assuming to have, assures the employee of safety, and the latter, relying on such assurance, goes to work, he will not be held as matter of law to have assumed the risk.

4. Plaintiff, a trammer in defendant's mine, was injured by the falling of ore from the roof of a drift. The shift boss had gone into the drift with his candle, and upon coming out had ordered plaintiff to go in and shovel, telling him the place was as safe as his home. It would have taken some examination of the roof with the aid of a light to ascertain what the condition was. *Held*, that it was a question for the jury whether plaintiff was excused from making such examination for himself.

5. Where plaintiff claimed that he was assured by defendant's shift boss that the place where he was directed to work was safe, and the evidence was such that the jury might find that he had a right to rely upon such assurance, it was proper to permit him to testify to the fact of such reliance.

6. Statements by counsel in the argument to the jury cannot be held to have constituted prejudicial error where there is no agreement and no authoritative statement in the record as to just what was said, and especially where the evidence seems, in a degree at least, to have warranted the alleged statements complained of.

7. Plaintiff, a Croatian unable to speak English, had made through an interpreter a statement to defendant of the circumstances of his injury. Upon the trial the interpreter and another Croatian, who had been present but who spoke a different dialect, were asked by defendant whether in their opinion plaintiff understood everything said by the interpreter when such statement was made. *Held*, that such questions were very near the border line of admissibility, and that the error, if any, in excluding them was not substantially prejudicial.

8. Where, after defendant had introduced and read a deposition, plaintiff was permitted to read to the jury the notice and certificate showing that the deposition was taken in the office of the warden of a penitentiary, thus allowing the jury to infer

that the witness was a convict, the error, if any, is not ground for reversal, in view of an admission by defendant's counsel at the trial that the witness was in fact a convict, since in case of a new trial this fact would probably be proved by record evidence.

9. Where plaintiff, a strong, healthy man thirty-seven years of age, earning $2.30 a day, lost his left leg four inches below the knee, was in the hospital for two months and under treatment for three months after that period, and was unable to walk without the aid of crutches at the time of the trial, three years after the injury, an award of $7,666.66 was not excessive.

APPEAL from a judgment of the circuit court for Milwaukee county: CHESTER A. FOWLER, Judge. *Affirmed.*

Personal injuries. The plaintiff, a Croatian, who could not speak English, was employed by the defendant company as a trammer in the fourteenth level of its mine at Ironwood, Michigan, and was seriously injured by the falling of ore from the roof of a drift, December 21, 1909, he being then about thirty-seven years of age. He was one of a shift of four men, composed of two miners and two trammers. There was a day shift and a night shift, and both were under the direction of a shift boss or foreman named Boalich. The place where the shift was working was in an old drift, the roof of which had settled down, and hence the old timbering was being taken out and new timbering being put in. At the place where the accident happened the old timbering had been removed and some quantity of earth, ore, and rock lay on the floor ready for removal, preparatory to putting in a new set of timbers. The duty of the trammers is to remove the fallen rock and ore and to load the same into small vehicles, called buggies, which run on a track to the chute. It is the duty of the miners to loosen the ore, and also to put in the timbers after the trammers have removed the ore and rock which has fallen. Boalich, the shift boss, testified that it was his duty to direct the men where, when, and how to work; that he had charge of the trammers, and it was part of his duty to see that the place where they work is safe and kept safe; that it

was his duty to tell them to keep out of dangerous places. All employees had candles and were supposed to carry them in their caps.    The plaintiff testified that he came to work on the day of the accident at about a quarter to 8 a. m.; that he greased his buggy; that he had a candle, but had put it behind a timber because the draft was so strong; that the shift boss came along and raised his candlestick and went into the place; that he called to plaintiff for a jumper and an auger, neither of which the plaintiff could find; that the shift boss then took a piece of wood or timber and went into the untimbered part of the drift and "was knocking down," and that then he told the plaintiff to come in there and shovel, and he (plaintiff) asked if it was a safe place and Boalich told him it was safer in there than it was in his own home; that he then went in and started shoveling dirt, and when he had shoveled fifteen or twenty shovels a body of iron ore fell on him from the roof and severely injured him.

There is no question of the injury or the seriousness of it raised in the case, but it is claimed on the part of the defense that no assurance of safety was given by Boalich, but that on the contrary he warned the plaintiff that it was dangerous, and it is also claimed that if the plaintiff had used his candle and examined the roof he could have himself seen the danger.

The following special verdict was returned by the jury:

"(1) Was it the custom, in the mine where plaintiff was injured, for the trammers to commence to remove ore or dirt only when directed to do so by the shift boss or miners? A. Yes.

"(2) Did the shift boss prior to plaintiff's injury order the plaintiff to commence removing the ore from the place where he was injured? A. Yes.

"(3) Did the shift boss before the plaintiff began work at the time of his injury assure the plaintiff that the place was safe? A. Yes.

"(4) Was the place at which plaintiff was injured reasonably safe? A. No.

"(5) If to the fourth question you answer 'No,' then an-

swer this question: Was the want of safety thus found the proximate cause of plaintiff's injury?  *A.* Yes.

"(6) Did the plaintiff know the place was unsafe? *A.* No.

"(7) Ought the plaintiff to have known the place was unsafe? *A.* No.

"(8) Was there any want of ordinary care on plaintiff's part that contributed to produce his injuries? *A.* No.

"(9) What sum will compensate the plaintiff for the injuries sustained? *A.* $7,666.66."

From judgment for the plaintiff on this verdict the plaintiff appeals.

For the appellant there was a brief by *Flanders, Bottum, Fawsett & Bottum,* attorneys, and *James G. Flanders,* of counsel, and oral argument by *Mr. Charles E. Monroe* and *Mr. Flanders.*

For the respondent there was a brief by *W. P. Crawford* and *Glicksman, Gold & Corrigan,* and oral argument by *Mr. Crawford* and *Mr. W. L. Gold.*

WINSLOW, C. J.  It is very well established that, in the absence of some statutory provision, an adult servant assumes the ordinary risks of his employment, and that the rule requiring the employer to furnish the servant a safe place to work has no proper application to such operations as building or mining and the like, where the working place is constantly changing and the servant is assisting in making the change himself.  In the present case, however, the jury have found on sufficient evidence that the plaintiff was assured by the shift boss before he went into that part of the drift where he was hurt that the place was safe.  The question presented on the merits is, therefore, whether the evidence was sufficient to justify the jury in finding that the plaintiff could lawfully rely upon that assurance and thus be excused from making any independent examination of the roof of the drift himself before going in to shovel out the rock.  We do not have

to go to other states for authorities on this question. This court has held that where an employee enters on a task attended by dangers which are just as obvious and apparent to him as to the master, he assumes the risk, notwithstanding an assurance by the master or his representative that there is no danger. *Showalter v. Fairbanks, M. & Co.* 88 Wis. 376, 60 N. W. 257. This court has also held upon ample authority that "if the employee has no actual knowledge of the danger, and it is not obvious to the sense but only to be ascertained by careful examination or test, and the master or superintendent having superior knowledge of the situation, or assuming to have such knowledge, assures the employee of safety, and the employee, relying on such assurance, goes to work, he will not be held as matter of law to have assumed the risk." *Holloway v. H. W. Johns-Manville Co.* 135 Wis. 629, 116 N. W. 635. If he will not be held to have assumed the risk, for a stronger reason he will not be held as matter of law to have been guilty of contributory negligence. According to the plaintiff's evidence here, the shift boss went into the dangerous place with his candle, and came out and ordered the plaintiff to go in and shovel up the *débris* on the floor, telling him that the place was as safe as his home. It is quite plain that it would take some examination of the roof with the aid of a light to ascertain what the condition was. It was clearly a question for the jury to pass upon, whether, in view of the order and the assurance, the plaintiff was excused from making any independent examination of the roof himself.

A number of detail errors are assigned which will now be considered.

1. The plaintiff examined Boalich, the shift boss, on the trial as an adverse witness, under sec. 4068 of the Statutes, and at the conclusion of the examination the court refused to allow the defendant's counsel to cross-examine him. This was error under the recent case of *Guse v. Power & M. M.*

*Co.* 151 Wis. 400, 139 N. W. 195. Boalich was, however, called as a witness by the defendant, and fully examined. It is not now suggested that the defendant has been deprived of the benefit of any testimony by reason of the fact that no cross-examination was permitted when Boalich was called by the plaintiff. It seems clear that no prejudice resulted from the erroneous ruling.

2. Against objection, the plaintiff was allowed to state that he believed the shift boss when he told him that the place was safe. This was entirely right. If, as we have held, there was room for the jury to find that the plaintiff could lawfully rely on the assurance of safety, then it was entirely proper for the plaintiff to testify to the fact of such reliance.

3. A controversy between counsel arose during the argument of plaintiff's counsel to the jury with regard to the propriety of certain of the counsel's remarks, the exact purport of which remarks does not certainly appear. The controversy arose in this way: One Sever had acted as interpreter between the plaintiff and the defendant's officers when the plaintiff went to the defendant's offices in July, 1910, and made a statement as to the circumstances under which the accident happened. In this statement, which was introduced in evidence on the trial, no mention was made of the assurance of safety, and it was claimed that it contradicted the plaintiff's evidence on the trial in other particulars. It was claimed by the plaintiff (who was a Croatian) that Sever talked a different language or dialect called Krain, and that he (plaintiff) could only understand a part of what Sever said. Upon the argument to the jury plaintiff's counsel made some statement with regard to the interpreter, the exact purport of which does not appear, but which was evidently a statement intended to discredit his testimony on the ground that he was or might have been in the pay or employ of the defendant. Counsel for the defendant interrupted the argument with an objection at this point and charged that counsel had stated

that the interpreter was the defendant's paid interpreter and under its control, of which fact there was no evidence. A colloquy followed between the court and both counsel, in the course of which counsel for plaintiff denied the correctness of defendant's version of his statement, and started to tell what he did say, when he was interrupted by the court, but finally succeeded in stating that he did not say to the jury that the interpreter was paid by the defendant. At last the trial court stated to the jury, on defendant's request, that there was no presumption that the defendant either hired, employed, or secured the interpreter. Defendant's counsel then asked the court to go further and state to the jury that there was no evidence that the interpreter was secured or paid by the defendant, and this request was refused by the trial judge in the following words:

"I don't think I will so instruct the jury. I will say in respect to the matter that the jury may draw such inference from the testimony in respect to the matter as they think proper and think just in that particular, and the fact that there is testimony that this man came to see this other man and that the man now representing the defendant, Mr. Norris, was present at the time the statement was procured. Now I think that is a fair way to leave the whole matter."

The testimony referred to by the trial judge was the plaintiff's testimony that he never knew the man Sever until he (Sever) came to see him and he did not know who brought him; that he (Sever) came from Hibbing, Minnesota, and talked to him; that he (plaintiff), together with one Scoban, a fellow workman, who was also hurt, went to the defendant's office and that Sever went with them and did the interpreting for both of them, in the presence of one of the defendant's attorneys. In view of the fact that there is no authoritative statement in the record as to just what was said by the plaintiff's counsel, and the further fact that the defendant's version of the statement is challenged as incorrect by the plaint-

iff's counsel, we are unable to see how we can say there was error here, much less prejudicial error. If it was a fact, as claimed by plaintiff, that the interpreter was a total stranger to him and came from Minnesota to see him without request from him, and then accompanied him to the defendant's office and acted as interpreter, not only for the plaintiff but also for Scoban, the other injured employee, in making statements wanted by the defendant company, we are unable to say that there might not be some inferences which could properly be drawn by the jury to the effect that the visit of the interpreter to the plaintiff and his subsequent action was in some way due to some request or inducement coming to him from the defendant.

4. Sever was a witness and was asked what in his judgment would be the chance for any part of plaintiff's statement not to have been understood by him (the plaintiff). The witness Scoban (who was another Croatian, speaking a somewhat different dialect) was also asked whether he thought plaintiff could understand everything Sever said to him at the time the statement was made. Objections by the plaintiff to these questions were sustained by the court, and error is now assigned upon these rulings. The questions may be said to be very near the border line of admissibility. Had they been permitted to be answered, we should have been slow to pronounce the rulings erroneous. Yet it is very apparent that the opinion of either witness as to how perfectly *Jakopac* understood what Sever said to him can only be an opinion based on very uncertain premises and can amount to little more than a guess. Even if the ruling be technically erroneous (a point we do not decide), it cannot be held to be substantially prejudicial.

5. The witness Sever was not present at the trial, but his deposition, which, after due notice, had been taken by the defendant in the office of the warden of the federal prison at Leavenworth, Kansas, was read. Plaintiff's counsel were not present at the taking of the deposition, so there was no cross-

examination of the witness.    After the testimony of the wit-
ness was read by defendant, plaintiff's counsel offered the no-
tice and certificate in evidence.    Objection was made by de-
fendant's counsel to the offer on the ground that they were
offered for the sole purpose of showing to the jury the fact
that the deposition was taken in the office of the warden of
the penitentiary, and thus allowing the jury to draw the in-
ference that the witness was a convict, whereas there were
two proper ways to prove that fact, namely, by cross-exami-
nation of the witness himself and by introduction of the rec-
ord of conviction.    The court overruled the objection and al-
lowed the notice and certificate to be read to the jury.    In
making the ruling the court said with regard to the recital
showing that the deposition was taken in the prison, "Oh, I
think it is proper merely to refer to it as a circumstance in
connection with the taking of the deposition, that is all."
Later the court said: "It is not evidence, strictly speaking,
but I think the facts set forth there are proper to bring to the
attention of the jury as showing the circumstances under
which the deposition was taken, that is all."

We should have been much better satisfied had the court
ruled otherwise.    But even if the ruling should be held to be
erroneous, the question whether it affirmatively appears that
any substantial right of the defendant has been affected by
the ruling remains to be considered.    Sec. 3072m, Stats.
While the discussion of the objection was proceeding in the
trial court in the absence of the jury, defendant's counsel
said, "Of course, the plaintiff in this case is not responsible
for the fact that the man *was incarcerated in the prison*.    The
only place where he could give notice would be notice within
the walls of the prison, because *they wouldn't let him out.*"
This seems to be an explicit admission that the fact was that
Sever was imprisoned for crime.    Doubtless if another trial
were ordered the plaintiff would produce the record and thus
satisfy the technical requirements of the law as to proof of
the fact.    Under such circumstances, it would seem almost

absurd to say that any substantial right of the defendant had been invaded by the ruling, even conceding it to be abstractly erroneous.   To send the case back to allow this fact to be proven by record evidence seems futile.   Our conclusion is that it does not appear that any substantial right of the defendant was affected by the ruling.

6. The objection that the damages are excessive must be overruled.   The plaintiff, a strong, healthy man of about thirty-seven years of age, earning $2.30 a day, lost his left leg four inches below the knee and was unable to walk without the aid of crutches nearly three years later when the action was tried.   The evidence certainly tended strongly to show that he is permanently incapacitated for labor.   He was in the hospital for two months and was being treated for three months after that period.   He still suffers some pain in bad weather, and doubtless this condition will also be permanent.   Under the circumstances we are not able to pronounce the damages excessive.

No other contentions require treatment.

*By the Court.*—Judgment affirmed.